[Cite as *State v. Quiller*, 2016-Ohio-8163.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 15AP-934 |
| v. | : | (C.P.C. No. 14CR-5190) |
| Carl M. Quiller, Jr., | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on December 15, 2016

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Steven L. Taylor*, for appellee. **Argued:** *Steven L. Taylor*.

**On brief:** *Wolfe Van Wey & Associates, LLC*, and *Marcus M. Van Wey*, for appellant. **Argued:** *Marcus M. Van Wey*.

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, P.J.

{¶ 1} Defendant-appellant, Carl M. Quiller, Jr., appeals from a judgment of the Franklin County Court of Common Pleas sentencing him to a term of life incarceration, with the possibility of parole after 31 years, pursuant to jury verdicts finding appellant guilty on two counts of felonious assault, one count of attempted murder, two counts of murder, and one count of tampering with evidence, and a guilty verdict following a bench trial on two counts of having a weapon under disability. Because we conclude the trial court did not err by denying appellant's motion to suppress statements he made to police or by admitting testimony from a forensic scientist regarding firearms identification, and that the jury verdicts were not against the manifest weight of the evidence, we affirm.

## I.  Facts and Procedural History

{¶ 2}   In the early morning hours of September 19, 2014, Gertrude Hall and Carlos Aguilar were sleeping in a field near Lockbourne Road in Franklin County, Ohio, between the point where Lockbourne Road intersects State Route 104 and the point where it intersects Koebel Road.  At approximately 4:30 a.m., Hall and Aguilar were awoken by a gunshot.  They saw a man holding a large flashlight, which obscured his face.  The man then fired multiple shots at Hall and Aguilar, striking both of them.  Hall was wounded by multiple shots, suffering injuries to the right side of her face and the area near her left shoulder.  Aguilar tried to shield Hall and was wounded in the right arm.  After firing at the couple, the shooter then walked away from them.  Hall later testified that she did not get a good look at the shooter, only seeing a glimpse of the side of his face.  Aguilar testified that he could make out the shooter's features.

{¶ 3}   Aguilar helped Hall to Lockbourne Road and then went to call for help from a nearby gas station and restaurant.  While she waited for help and tried to flag down passing cars, Hall saw a man riding a bicycle in and around some nearby bushes. Hall later stated that the man disappeared when police and paramedics arrived.  Hall told police that the man on the bicycle asked whether she needed help and she responded that help was on the way.  Aguilar also testified that he saw a man circling on a bicycle near the gas station and restaurant before police arrived.

{¶ 4}   Officers from the Columbus Division of Police and paramedics from the Columbus Fire Department were dispatched to the gas station and restaurant, where they found Aguilar, who directed them to the area where Hall was located.  Aguilar also helped police officers identify the area where the shooting occurred.  A crime scene search detective collected two TulAmmo .40 caliber Smith and Wesson shell casings from the scene.

{¶ 5}   Early the following morning, on September 20, 2014, Columbus police officers were dispatched to the scene of a shooting at 2910 Lockbourne Road, just south of the intersection of Lockbourne and Watkins Roads.  The victim, Thomas Henson, was sitting in a pickup truck with his head on a pillow resting against the driver's side door. Henson had suffered a gunshot wound to the head that entered behind his left ear and exited through his right eye.  Henson was bleeding severely and gasping for breath when

police officers and paramedics arrived; he died after being transported to a nearby hospital. When officers arrived, appellant was standing near the truck, holding the pillow against Henson's wound with his elbow and talking with the emergency dispatcher on a cell phone. Appellant's bicycle was located near the truck.

{¶ 6} Appellant told responding officers that he had been riding his bicycle past the scene and approached Henson's truck because something appeared to be wrong. Appellant told officers that when he saw that Henson had been shot, he rode his bicycle home to obtain a working cell phone and then returned to the scene while calling 911. Appellant also told one officer that he had been in the area on the prior morning and had seen Hall after she had been shot. The officer later testified that appellant seemed to be upset that police officers responding to the Hall/Aguilar shooting had not asked him about that incident. Crime scene investigators later recovered a .40 caliber spent projectile from the floorboard of Henson's truck and a TulAmmo .40 caliber Smith and Wesson shell casing from the bed of the truck.

{¶ 7} Appellant was transported to Columbus police headquarters on September 20, 2014, where he was interviewed by Detectives Jennifer Gribi and Brad White. After gathering some background information, including appellant's date of birth and address, detectives left the interrogation room for slightly over one hour. Upon returning to the interrogation room, Detective Gribi read appellant his constitutional rights and asked whether he understood those rights. Appellant responded that he did and Detective Gribi then asked appellant what it meant to him. Appellant answered "uh, if I choose to not talk, uh, I can have a lawyer present, but if I refuse, it's up to me."[1] (State's Ex. 4 at 9:05:37 - 9:05:48, June 2, 2015 Suppression Hearing.) Detectives Gribi and White then continued to question appellant. During the interview, portions of which were later played for the jury at trial, appellant initially claimed that he was out on his nightly bicycle ride when he saw Henson's truck. He stated he had previously seen Henson sleeping in that area and had spoken to him briefly. Appellant stated he

---

[1] We note that the transcript of the suppression hearing quoted appellant as responding: "If I choose to not talk without a lawyer present, if I choose somebody." (June 2, 2015 Tr. at 131.) However, the transcript also noted that the audio was difficult to hear and that the court reporter was not providing a verbatim transcription. (*See* June 2, 2015 Tr. at 123.) At the suppression hearing, counsel for the state referred to appellant as having said "I choose not to talk then I can have a lawyer present. If I refuse it's up to me." (June 2, 2015 Tr. at 165.) Appellant's response was muffled but, based on our review of the video, we believe that appellant responded as indicated in the text of this decision.

approached the truck because he saw broken glass on the ground outside the driver's side window, and the pillow and Henson's head were hanging out the driver's side window. Appellant claimed he looked into the truck and saw that Henson was bleeding. Appellant stated that his cell phone battery had died, so he rode his bicycle home to get a working cell phone and then called 911 as he rode back to the scene, and held the pillow against Henson's head while waiting for help to arrive.

{¶ 8} Appellant also told detectives he had seen Hall the prior morning as she sat near Lockbourne Road when he was out riding his bicycle. He claimed that he asked Hall whether she was okay and she responded that she had been shot in the mouth and asked appellant to get help. Appellant claimed that he rode to the nearby gas station and restaurant where he could see police officers, but by the time he arrived police and paramedics were driving toward Hall. When asked whether he had recently fired a gun, appellant claimed that within the past few weeks he had fired a friend's .40 caliber handgun at a transmission fluid bottle placed into a tree as a target. Appellant told detectives he did not own any guns, and stated that his father owned a couple of shotguns and rifles, but no handguns.

{¶ 9} On September 20, 2014, while appellant was in police custody, Hall, who was still in the hospital being treated for her wounds, was shown a photo lineup that included a photograph of appellant. She identified an individual who was not appellant from the lineup as the shooter. Hall later testified that her identification was based solely on the individual's cornrow hairstyle, rather than his face. That same day, Aguilar, who spoke very little English, was also shown the same photo lineup. Aguilar identified a different individual than Hall had identified from the lineup, but did not identify appellant as the shooter.

{¶ 10} While appellant was in police custody, a search warrant was obtained for appellant's home, which was less than one mile from the Hall/Aguilar crime scene and a half mile from the Henson crime scene. During the search of appellant's home, officers found a Hi-Point Firearms model JCP .40 caliber semiautomatic handgun under a mattress in the basement where appellant slept, which was later identified as appellant's bed. The gun contained two live rounds of TulAmmo .40 caliber Smith and Wesson ammunition, one located in the chamber and one located in the magazine. Mark Hardy, a

Columbus police forensic scientist, later testified at trial that the two shell casings recovered from the scene where Hall and Aguilar were shot on September 19, 2014 were fired by the handgun recovered from appellant's home. He also testified that the spent projectile and spent casing recovered from Henson's truck were also fired by the handgun recovered from appellant's home. Another Columbus police forensic scientist testified at trial that a partial DNA profile was identified on the handgun, which was consistent with appellant's DNA profile. A partial DNA profile containing a mixture of two individuals was identified on the magazine; appellant was the major contributor to that DNA mixture.

{¶ 11} When confronted by Detectives Gribi and White about the handgun found under his mattress, appellant initially claimed that he did not put anything under the bed but his tax returns. Appellant later told detectives that a friend, Kaishawn Johnson, had come to appellant's home in the early morning hours of September 20, 2014 because they planned to smoke together. Appellant stated he told Johnson to wait while he finished watching a television show and that Johnson briefly left and then returned. Appellant claimed that when Johnson returned he showed appellant a gun; appellant stated he smelled the gun and could tell it had recently been fired. Appellant asserted that Johnson told him, "I popped somebody," and then told appellant where this occurred. (State's Ex. II2 at 39:25 - 39:29.) Appellant stated he took the gun from Johnson, ran into the house and hid it under his mattress, and then rode his bicycle to the place Johnson told him the shooting occurred because he did not believe Johnson. Appellant claimed he then rode back home to get a cell phone to call police and that Johnson was gone by the time he returned home. Appellant denied shooting Hall, Aguilar, or Henson. Appellant identified a photograph of Johnson for detectives. Detective Gribi subsequently determined that Johnson had been incarcerated in the Franklin County Jail at the time of the two shooting incidents, having been in custody beginning on September 18, 2014. Detectives told appellant this and informed him that he was being charged with murder. The police officer who escorted appellant from the interview room to have his mugshot taken testified at trial that appellant stated, "I don't know why I did it." (Tr. Vol. III at 495.) He further testified that appellant then said, "I tried to clot it, clot the hole. You know, I don't know why." (Tr. Vol. III at 495.)

{¶ 12} Appellant was charged with two counts of felonious assault and two counts of attempted murder with respect to Hall and Aguilar, two counts of murder with respect to Henson, and one count of tampering with evidence, which were tried before a jury. Appellant was also charged with two counts of having a weapon under disability; he waived his right to a jury trial and those charges were tried by the court. The jury found appellant guilty on all charges except the charge of attempted murder with respect to Aguilar, and the trial court found appellant guilty on the two weapon under disability charges. The trial court found the two murder charges merged for purposes of sentencing and that the felonious assault and attempted murder charges with respect to Hall also merged for purposes of sentencing. The court sentenced appellant to a total term of life incarceration, with the possibility of parole after 31 years.

## II.  Assignments of Error

{¶ 13} Appellant appeals and assigns the following three assignments of error for our review:

> [I.] THE TRIAL COURT ERRED IN DETERMINING THAT THE APPELLANT WAIVED HIS MIRANDA RIGHTS IN A KNOWING, INTELLIGENT AND VOLUNTARY MANNER.
>
> [II.] THE TRIAL COURT ERRED BY ALLOWING A POLICE FIREARMS EXAMINER TO TESTIFY THAT THE GUN AND SHELL CASINGS IN EVIDENCE WERE A MATCH TO "REASONABLE DEGREE OF PRACTICAL SCIENTIFIC CERTAINTY."
>
> [III.] THE JURY'S VERDICTS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

## III.  Discussion

{¶ 14} In his first assignment of error, appellant argues the trial court erred by determining that he knowingly, intelligently, and voluntarily waived his right to remain silent and his right to have an attorney present during questioning by police. Appellant moved to suppress the statements he made to police, but the trial court denied the motion to suppress. Redacted portions of the recorded police interview with appellant were played for the jury at trial.

{¶ 15} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. *See also State v.*

*Belton*, __ Ohio St.3d __, 2016-Ohio-1581, ¶ 100, citing *Burnside*. In evaluating the motion to suppress, the trial court acts as the finder of fact and, therefore, is in the best position to resolve factual questions and evaluate the credibility of witnesses. *Burnside* at ¶ 8. Therefore, we must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Id.* "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id. See also State v. Johnson*, 10th Dist. No. 13AP-637, 2014-Ohio-671, ¶ 6 ("We apply a de novo standard in determining whether the trial court properly denied appellant's motion to suppress.").

{¶ 16} "A suspect in police custody 'must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.' " *State v. Lather*, 110 Ohio St.3d 270, 2006-Ohio-4477, ¶ 6, quoting *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). A suspect may waive these rights, but the waiver must be voluntary and made with a full awareness of the nature of the right being abandoned and the consequences of the decision to abandon it. *Id.* at ¶ 7. "If custodial interrogation continues in the absence of an attorney after a police officer advises a suspect of his rights, the government bears 'a heavy burden' to demonstrate by a preponderance of the evidence that the suspect 'knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel' before speaking to the police." *State v. Barker*, __ Ohio St.3d __, 2016-Ohio-2708, ¶ 23, quoting *Miranda* at 475. "A court may infer from the totality of the circumstances that a defendant voluntarily, knowingly, and intelligently waived his [*Miranda*] rights." *State v. Valentine*, 10th Dist. No. 14AP-893, 2016-Ohio-277, ¶ 11, citing *State v. Clark*, 38 Ohio St.3d 252, 261 (1988), and *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, ¶ 52. The totality of the circumstances includes the accused's age, mentality, and prior criminal experience; the length, intensity, and frequency of the interrogation; the existence of physical deprivation or mistreatment; and the existence of inducement or threat. *Id.* at ¶ 11.

{¶ 17} Appellant argues that although he indicated he understood his rights, his comments to Detective Gribi when she asked what the statement of rights meant

indicated that he did not fully and appropriately understand those rights. The Supreme Court of Ohio has held that "[w]here a suspect, after being fully apprised of his constitutional rights under *Miranda* * * *, indicates an understanding of those rights, but subsequently acts in such a way as to reasonably alert the interrogating officer that the warnings given have been misapprehended, the officer must, before any further questioning, insure that the suspect fully understands his constitutional privilege against self-incrimination, as described in *Miranda*." *State v. Jones*, 37 Ohio St.2d 21 (1974), syllabus.

{¶ 18} In *Jones*, the defendant was presented with a form explaining his rights under *Miranda* and the interrogating detective read the form aloud to him. *Id*. at 23. The detective later testified that the defendant indicated that he understood his rights, but refused to sign the rights waiver until he had spoken with his attorney. *Id*. at 24. The detective began interviewing the defendant, who participated willingly until the detective began to take notes. The defendant objected to the taking of notes and refused to speak further if anything was written down. When the detective put away the notepad and continued the interrogation, the defendant continued to respond and, in the course of the interrogation, made an incriminating statement he later sought to have suppressed as involuntary. *Id*. On appeal, the defendant claimed that during the interrogation he mistakenly believed that only written statements could later be used against him. *Id.* at 25. The court found that the defendant's refusal to sign a written waiver of his rights before conferring with his attorney and his objection to the detective's taking of notes was consistent with this alleged mistaken belief. Under these circumstances, the court found that the state had not met the heavy burden of establishing that the defendant knowingly and intelligently waived his *Miranda* rights, explaining that:

> We do not require police officers to probe a suspect's motives after his *Miranda* rights have been clearly explained, he indicates an understanding of them, and then demonstrates a willingness to speak. What we do require, however, is that when a defendant subsequently acts in such a way as to reasonably alert an interrogating officer that the warnings given have been misapprehended, the officer must, before any further questioning, insure that the defendant fully and correctly understands his Fifth Amendment rights.

*Id*. at 26-27. *See also State v. Parker*, 44 Ohio St.2d 172, 174-78 (1975) (applying *Jones*).

{¶ 19} This court rejected a defendant's argument that the interrogating police officer should have questioned him further to ensure that he understood the rights he was waiving in the *Valentine* decision. *Valentine* at ¶ 18-21. Valentine was interviewed by police about possession of a gun. The interrogating officer advised Valentine of his *Miranda* rights and asked whether he understood them or had any questions about the rights. Valentine responded that he did not have any questions about the rights. *Id.* at ¶ 12. Valentine then indicated he wished to make a statement and told the interrogating officer that he had recently been released from the Ohio Hospital for Psychiatry. He also indicated he had been diagnosed as manic depressive and that he lost touch with reality at times. *Id.* at ¶ 13. When the interrogating officer asked about his current mental state, Valentine indicated he was not in the best mood. The officer ultimately asked whether Valentine felt he was in a mental condition that he could answer questions honestly, and he responded that he might answer "a little too honestly." *Id.* Valentine then told the officer about an altercation with a woman from whom he sought to collect money, and admitted that he had a gun in his coat pocket that day but did not have a license to carry a concealed weapon. *Id.* Valentine refused to answer when asked whether the woman owed him money for drug transactions. *Id.* He was ultimately convicted of carrying a concealed weapon. *Id.* at ¶ 3.

{¶ 20} On appeal, Valentine cited *Jones* and argued that the interrogating officer needed to ask additional questions to ensure that he understood his *Miranda* rights after he disclosed his mental health issues. *Id.* at ¶ 18. This court rejected that argument, finding that *Jones* was distinguishable. The court concluded that Valentine said nothing that would have reasonably alerted the interrogating officer that he misunderstood his rights. *Id.* at ¶ 20. The interrogating officer later testified that Valentine appeared coherent and appeared to understand the question about whether he understood his *Miranda* rights. The court held that the fact that Valentine told the officer about his mental condition and a recent stay in a mental facility did not indicate that he misunderstood his rights. Further, the court noted that Valentine was "able to intelligently and coherently explain his situation to [the interrogating officer] and the altercation that led to his arrest." *Id.* Valentine "also understood enough during the interview to refuse to answer [the interrogating officer's] question regarding whether [he]

was meeting the woman to collect money for a drug transaction."  *Id.*  The court concluded that Valentine did not act in a manner that would have reasonably alerted the interrogating officer that he misunderstood his *Miranda* rights, even though the officer was aware of his mental condition.  *Id.*  Accordingly, the interrogating officer "was not under any obligation pursuant to *Jones* to further question [Valentine] about his understanding of the *Miranda* rights once he indicated he understood them." *Id.*

{¶ 21} In the present case, Detective Gribi began the interview with appellant by obtaining background information, such as his date of birth and address.  She and Detective White then left the interrogation room for slightly longer than one hour while obtaining other information about the investigation.  When they returned to the interrogation room, Detective Gribi confirmed that appellant spoke English, that he had completed the 12th grade, and that he could read and write.  Detective Gribi also asked appellant whether he had any hearing problems, whether he wore glasses or contact lenses, and whether he had consumed alcohol or drugs in the prior 24 hours; appellant responded no to each of these questions.  Detective Gribi asked appellant if he had ever had his constitutional rights read to him before.  Appellant responded that he had and asked why his rights were being read to him.  Detective Gribi provided appellant with a written copy of his constitutional rights and read it to him.  After reading the document, Detective Gribi asked whether he understood it, and appellant responded "yeah."  She then asked appellant what it meant to him.  Appellant answered "uh, if I choose to not talk, uh, I can have a lawyer present, but if I refuse, it's up to me."  (State's Ex. 4 at 9:05:37 - 9:05:48, June 2, 2015 Suppression Hearing.)  Detective Gribi did not ask appellant to sign the written acknowledgment of his constitutional rights.  Detectives Gribi and White then proceeded to interview appellant about the events of September 19th and 20th.  Detective Gribi testified at the suppression hearing that appellant never indicated he did not want to talk to detectives or answer questions and he never requested an attorney.  Appellant generally appeared calm and cooperative throughout the interview and spoke freely to detectives.

{¶ 22} Appellant argues that his response when asked what the constitutional rights form meant demonstrated that he believed he could only have an attorney present if he chose not to speak.  Appellant claims that, based on the Supreme Court's holding in

*Jones*, Detective Gribi had a duty to ask follow-up questions to ensure that appellant was knowingly and intelligently waiving his rights and that, because Detective Gribi did not ask those questions, his subsequent statements should have been suppressed due to lack of a knowing and intelligent waiver of his constitutional rights. After reviewing the video of the exchange between Detective Gribi and appellant, we reject appellant's argument. It is not clear that appellant believed his second statement (i.e., "I can have a lawyer present") was contingent on his first statement (i.e., "[i]f I choose to not talk"). Appellant briefly paused between the two statements, suggesting that these were two distinct, incomplete thoughts, rather than a single, connected concept. Moreover, appellant's third statement (i.e., "but if I refuse, it's up to me") suggested that appellant understood it was ultimately his decision whether to speak to police and whether to have an attorney present. Appellant did not request an attorney and did not hesitate to participate in the interview. Unlike the scenario in *Jones*, there also was no subsequent conduct during the interview that would have reasonably alerted Detective Gribi that appellant misunderstood his constitutional rights. Under these circumstances, we conclude the trial court did not err by denying the motion to suppress based on its conclusion that appellant knowingly, intelligently, and voluntarily waived his constitutional rights.

{¶ 23} Accordingly, we overrule appellant's first assignment of error.

{¶ 24} Appellant argues in his second assignment of error that the trial court erred by allowing forensic scientist Mark Hardy to testify that he concluded to a reasonable degree of scientific certainty that the spent projectile and three casings recovered from the crime scenes were fired from the handgun recovered from under appellant's bed. Appellant cites Hardy's testimony that his identification was based on a visual microscopic examination of various characteristics, but that there was no numerical standard for determining that two samples were a match. Based on this testimony, appellant argues that firearms identification is a subjective process and that Hardy's characterization gave the jury an incorrect impression of the reliability of this evidence.

{¶ 25} Appellant objected to Hardy's testimony at trial, and the trial court overruled the objection. Hardy was admitted to testify as an expert in the field of firearms operability and firearms examination and identification. "The admission of expert testimony is within a trial court's discretion." *State v. Williams*, 74 Ohio St.3d 569, 576

(1996).  Therefore, we will not reverse a trial court's decision to admit expert testimony absent an abuse of discretion.  An abuse of discretion occurs when a court's ruling is "unreasonable, arbitrary or unconscionable."  *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 26} Appellant acknowledges that this court previously upheld a trial court's admission of similar firearms identification testimony in *State v. Johnson*, 10th Dist. No. 05AP-12, 2006-Ohio-209.  As we explained in that decision, Evid.R. 702 provides that a witness may testify as an expert when the testimony relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons, the witness is qualified as an expert by specialized knowledge, skill, experience, training or education regarding the subject matter of the testimony, and the testimony is based on reliable scientific, technical, or other specialized information.  *Id.* at ¶ 12.

{¶ 27} *Johnson* further held:

> To determine the reliability of expert scientific testimony, a court must assess whether the reasoning or methodology underlying the testimony is scientifically valid. To make that assessment, several factors are to be considered: (1) whether the theory or technique has been tested; (2) whether it has been subjected to peer review; (3) whether there is a known or potential rate of error; and (4) whether the methodology has gained general acceptance.

(Internal citations omitted.) *Id.* at ¶ 13.

{¶ 28} In *Johnson*, Hardy also served as the state's expert witness regarding firearms identification. He testified that he compared markings on spent casings recovered from the victim's house to markings on a live round of ammunition recovered from a vehicle in which the defendant had been a passenger.  *Id.* at ¶ 8.  He explained that the characteristics a gun imparted on a bullet casing were the same regardless of whether the gun was fired, and that the methodology of comparing marks on live rounds to spent casings was the same type of testing used when comparing different spent casings.  *Id.* at ¶ 15.  He further testified that the tests were scientifically valid and commonly accepted in the scientific community.  *Id.*  This court concluded that, given Hardy's explanation of this methodology, the trial court did not abuse its discretion by admitting the testimony

because Hardy's opinion was based on reliable, commonly accepted scientific principles. *Id.*

{¶ 29} Citing *State v. Langlois*, 6th Dist. No. L-11-1313, 2013-Ohio-5177, from the Sixth District Court of Appeals, appellant argues that in the decade since *Johnson*, comparative ballistics evidence has received increased scrutiny. In *Langlois*, the defendant pointed to federal court decisions limiting the scope of ballistics expert testimony and reports from the National Research Council purporting to question the reliability of firearms identification, tool mark, and ballistics analysis. *Id.* at ¶ 21. Ultimately, although the Sixth District acknowledged the federal decisions, it concluded that Ohio courts have generally held that "the methodology of comparatively analyzing and testing bullets and shell cases recovered from crime scenes is reliable." *Id.* at ¶ 41. Other than citing *Langlois*, and two federal court decisions that were cited in *Langlois*, appellant has provided no authority or argument that would lead this court to reverse our decision in *Johnson*, 2006-Ohio-209.

{¶ 30} Similar to *Johnson*, in the present case Hardy testified extensively regarding his credentials and experience, and the methodology used in comparing the tool marks on the spent projectile and shell casings recovered from the crime scenes and those on test rounds fired from the handgun recovered from appellant's home. He testified that numerous studies have validated this process of firearms identification. Although Hardy conceded that there was no numerical standard for determining that different samples matched, he explained that the process was based on examining multiple characteristics that, when viewed together as a pattern, could identify a unique firearm. Based on this testimony, we conclude the trial court did not abuse its discretion by overruling appellant's objection and permitting Hardy to testify that his conclusions were reached to a reasonable degree of scientific certainty.

{¶ 31} Accordingly, we overrule appellant's second assignment of error.

{¶ 32} Appellant argues in his third assignment of error that the jury's verdicts were against the manifest weight of the evidence. Specifically, appellant asserts that there was no substantial evidence to establish that he was the shooter in either incident. Appellant notes that neither Hall nor Aguilar identified him as the shooter when viewing the photo lineups, and that each identified a different individual. Appellant also argues

that DNA was only collected from the outside surfaces of the handgun, and appears to suggest that the presence of his DNA on the gun may have been due to contact with his bed.

{¶ 33} "When presented with a challenge to the manifest weight of the evidence, an appellate court may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. McCrary*, 10th Dist. No. 10AP-881, 2011-Ohio-3161, ¶ 12, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). This authority " 'should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). In conducting our review of the evidence, "we are guided by the presumption that the jury, or the trial court in a bench trial, 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6, quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

{¶ 34} Appellant correctly notes that both Hall and Aguilar failed to identify him as the shooter in the photo lineup and, in fact, each identified a different individual who was not appellant. However, Hall later testified that her identification was solely based on the individual's "cornrow" hairstyle. (Tr. Vol. I at 102.) At the time of the incidents, appellant had a hairstyle that was characterized as cornrows, dreads, or twiggies/twisties.[2] Moreover, both Hall and Aguilar testified that the shooter shined a bright flashlight in their faces and that the shooting occurred during the early morning hours. The jury was aware of the fact that both Hall and Aguilar selected different individuals, who were not appellant, from the photo lineup, in weighing the state's evidence.

{¶ 35} Despite the incorrect identifications by Hall and Aguilar, we cannot conclude that this is an exceptional case where the evidence weighs heavily against the

---

[2] Detective White used the term "twiggy hair" in characterizing Hall's description of the shooter. (State's Ex. II2 at 10:14.) Appellant referred to his hair as not being "twisties" or "twistys," but, rather, as "dreads." (State's Ex. II2 at 10:31 - 10:34.)

conviction. Appellant's own statements placed him in close proximity to the scenes of both shootings. The handgun, which was recovered from under appellant's bed and contained traces of his DNA, matched the shell casings recovered from the Hall/Aguilar shooting scene and the spent projectile and shell casing recovered from the Henson shooting scene. Additionally, appellant's alibi for how the gun came to be under his bed— i.e., that Johnson brought it to appellant's home and that appellant hid the gun under the bed for Johnson—was demonstrably false, because Johnson was in police custody on September 20th (and at the time of the shooting on the prior morning). Under these circumstances, we cannot find that the jury clearly lost its way in concluding that appellant was the shooter and finding him guilty.

{¶ 36} Accordingly, we overrule appellant's third assignment of error.

## IV. Conclusion

{¶ 37} For the foregoing reasons, we overrule appellant's three assignments of error and affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

SADLER and BRUNNER, JJ., concur.

———————————