[Cite as *State v. Fuell*, 2021-Ohio-1627.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2020-02-008 |
| | : | O P I N I O N |
| - vs - | | 5/10/2021 |
| | : | |
| AUSTIN M. FUELL, | : | |
| Appellant. | : | |


CRIMINAL APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case Nos. 2019 CR 0992 and 2019 JA 55668


Mark J. Tekulve, Clermont County Prosecuting Attorney, Nick Horton, 76 South Riverside Drive, 2nd Floor, Batavia, Ohio 45103, for appellee

Timothy B. Hackett, Assistant State Public Defender, 250 East Broad Street, Suite 1400, Columbus, Ohio 43215, for appellant


**BYRNE, J.**

{¶1} Austin Fuell appeals from the Clermont County Common Pleas Court. The juvenile division transferred Fuell to the adult division to face murder charges after conducting a mandatory transfer hearing, also known as a bindover hearing. After Fuell pleaded guilty to murder, the adult division imposed a mandatory sentence of life in prison with the possibility of parole after 15 years. Fuell appeals his transfer to adult court and his sentence. For the reasons discussed below, we affirm.

## I. Proceedings and Testimony in the Juvenile Division

{¶2}    Police filed a complaint in the Clermont County Court of Common Pleas, Juvenile Division, alleging that Fuell – then seventeen years old – was a delinquent child for having committed acts that if committed by an adult would have constituted murder, aggravated robbery, and aggravated burglary.  The complaint alleged that Fuell and an accomplice were suspects in a home invasion and robbery that occurred on June 11, 2019.  During the robbery, one of the suspects shot and killed Jordan Ketring, who was staying at the home.

{¶3}    The state moved for Fuell's mandatory transfer to the adult division of the common pleas court for criminal prosecution.  To determine whether transfer was mandatory, on July 29 and October 4, 2019, the juvenile court held a probable cause hearing pursuant to R.C. 2152.12(A) and Rule 30 of the Ohio Rules of Juvenile Procedure.  The state presented the testimony of several witnesses.  We have summarized those witnesses' testimony below.

### A.  Testimony of Payge Lacey

{¶4}    Payge Lacey was Ketring's girlfriend.  During the relevant time period, the two lived at Lacey's grandparents' home located at 822 Wards Corner Road in Clermont County.

{¶5}    Lacey and Ketring met Fuell on three occasions over several days leading up to Ketring's death on June 11.  These encounters were all drug exchanges – that is, Ketring sold Xanax to Fuell during each meeting, with the exception of the last meeting.  The first encounter was at Lacey's grandparents' home.  The second was near a car dealership. The third encounter was on June 8, 2019.  The parties met at a Planet Fitness location on Fields-Ertel Road in Warren County.  However, once all the parties arrived at Planet Fitness, the meetup was moved to a nearby Comfort Inn.  In the parking lot of the Comfort Inn, Ketring and Fuell got into a physical altercation and Ketring robbed Fuell of $375.  Ketring

retreated to his vehicle and he, Lacey, and another individual who was with them fled the scene. Fuell fired gunshots in their direction as they were leaving.

{¶6} Three days later, in the early morning hours of June 11, 2019, Lacey was with Ketring at her grandparents' home. They were settling down to sleep when two people wearing all black clothing and masks came into the home. The intruders told Lacey and Ketring to get down on the ground. The intruders had guns and demanded to know the location of a safe.

{¶7} Though the intruders were wearing masks, Lacey could see the intruders' eyes. She believed that one of the intruders was Fuell, as she recognized his eyes, which she described as "further back" or "indented" in his skull. She also recognized this intruder's voice as Fuell's voice. Lacey said that the other intruder walked off and came back later with a safe. Then, the person she believed was Fuell said to Ketring, "Where is my $375?" Lacey testified that when she heard this comment, she became 99.9% certain the intruder was Fuell because $375 was the exact amount that Ketring had stolen from Fuell at the Comfort Inn a few days before.

{¶8} Ketring, who was armed with a revolver, began arguing with Fuell and asking whether $375 was worth his life or the risk of going to prison for life. At some point, shooting began between Ketring and the intruders. Ketring was shot and fell over. The two intruders fled.

**B. Testimony of Detective Dan Tobias**

{¶9} Dan Tobias, a detective with the Miami Township Police Department, testified that he investigated the shooting. Ketring, who had been shot in the torso, died from his injuries. Detective Tobias quickly developed Fuell as a suspect based on interviews with various witnesses. He was also able to corroborate Lacey's claims concerning the June 8 robbery through surveillance videos depicting vehicles and people at Planet Fitness and

Comfort Inn.

{¶10} Detective Tobias identified Fuell's cell phone number by speaking with multiple witnesses who provided him the number. He also located a receipt in a vehicle associated with an acquaintance of Fuell. Fuell's name and phone number had been written on the receipt.

{¶11} Detective Tobias testified concerning an exhibit entitled "Cell Tower Analysis." This document had been produced by an analyst at the Bureau of Criminal Investigation (BCI) based on cell phone location data records that Detective Tobias had obtained from Sprint. The exhibit contained a map which depicted the cell phone towers being used by the cell phone associated with Fuell's phone number between the hours of 12:00 a.m. and 5:00 a.m. on June 11, 2019. The map showed the phone being located on the west side of Cincinnati, where Fuell lived, at approximately 2:00 a.m. The phone then tracked towers heading east and ending in the vicinity of 822 Wards Corner Road near or around the time of the home invasion at 3:15 a.m. Afterwards, the phone location appeared to move back to the west side of Cincinnati and pinged the original tower on the west side of Cincinnati at 4:10 a.m.

{¶12} As part of his investigation, Detective Tobias interviewed Kevin Baird, a mutual friend of Lacey and Fuell. Detective Tobias' contact with Baird produced another exhibit he discussed during his testimony, which consisted of multiple photographs that Detective Tobias took of the screen of Baird's cell phone. These photographs depicted a series of text messages and missed calls between Baird and a contact on Baird's phone who appeared to be Fuell. That is, Fuell's photograph was depicted alongside the text messages as the sender, and the contact name in the phone was listed as "Austin." Detective Tobias' photos of the text messages are referred to herein as the "Text Message Photographs."

{¶13} The screen photographs showed the person assumed to be Fuell asking Baird for Lacey's address at approximately 12:30 a.m. on June 11, 2019, less than three hours before the home invasion. The screen photos further show that, shortly thereafter, Baird responded with the address of 818 Wards Corner Road, which was the residence directly behind 822 Wards Corner Road.[1]

{¶14} Detective Tobias testified that after Fuell became a potential suspect, police began surveilling his residence, which was Fuell's grandmother's home. During that time, Fuell and his grandmother left the residence in a vehicle. Police pulled the vehicle over and, after a consensual search, recovered a gun barrel in the glove box. Later that day, detectives executed a search warrant at Fuell's residence and recovered an intact Sky Industries 9mm Luger pistol. Both the recovered gun barrel and the pistol were sent to BCI for comparison testing against cartridges and a bullet recovered from the scene of the home invasion, and a bullet recovered from Ketring's body.

## C. Testimony of Matthew White

{¶15} Matthew White, a BCI forensic firearms examiner, testified that he had approximately 20 years of experience as a forensic firearm and tool mark examiner and was a member of the Association of Firearm and Tool Mark Examiners. The court recognized White, without objection, as an expert witness in the field of ballistics.

{¶16} White testified that he had examined the recovered bullets and cartridges as well as the submitted gun barrel and pistol. White testified that microscopic comparison testing of the submitted items revealed that the gun barrel recovered from the glove box matched the recovered bullets, including the bullet that killed Ketring. White further noted that the glove box gun barrel was chambered in a 9mm Luger and was a compatible barrel

---

1. As stated above, Fuell had visited Lacey's grandparents' home a few days before, so he presumably recognized the correct address when he arrived.

with the Sky Industries pistol recovered from Fuell's residence. However, the gun barrel inside the 9mm Luger pistol recovered from Fuell's home was not a match to the bullets recovered by police.

### D. Testimony of Bruce Redd

{¶17} Bruce Redd testified that he was the manager of the American Trading Company, a store that sells firearms on the west side of Cincinnati. On June 11, 2019, Fuell and his grandmother entered the store. Fuell's grandmother told Redd that she wanted a firearm for security purposes. Redd suggested she consider a shotgun. Instead, although there were approximately 100 firearms from which to choose, Fuell's grandmother specifically pointed at a Sky Industries 9mm in the gun case and said, "that's the one I want." The federal firearms transfer paperwork indicated that Fuell's grandmother purchased the pistol at 4:26 p.m. on June 11, 2019.

### E. Juvenile Court's Transfer Decision

{¶18} In October 2019, the juvenile court issued a judgment entry finding that Fuell was 17 years old at the time of the alleged offenses and finding probable cause to conclude that Fuell committed the alleged offenses. Accordingly, the juvenile court ordered that Fuell be transferred to the adult division of the common pleas court pursuant to R.C. 2152.12(A) for further criminal proceedings.

### II. Proceedings in the General Division

{¶19} After Fuell's transfer to adult court – that is, the Clermont County Court of Common Pleas, General Division – a grand jury indicted Fuell on one count of aggravated murder, two counts of murder, and one count of kidnapping, all with firearm specifications, as well as one count of tampering with evidence. Fuell later pleaded guilty to one count of murder and the state agreed to dismiss the firearm specification as well as the remaining counts. The court sentenced Fuell to life in prison with the possibility of parole after fifteen

years, a mandatory sentence for a defendant convicted of murder as set forth in R.C. 2929.02(B)(1): "whoever is convicted of or pleads guilty to murder in violation of section 2903.02 of the Revised Code shall be imprisoned for an indefinite term of fifteen years to life."[2]

### III. Assignments of Error and Analysis

{¶20} Fuell appealed and assigned five errors for our review. We will address the first two assignments of error collectively.

{¶21} Assignment of Error No. 1:

{¶22} THE CLERMONT COUNTY JUVENILE COURT VIOLATED AUSTIN FUELL'S CONSTITUTIONAL RIGHTS WHEN IT ADMITTED LOCATION DATA BASED ON UNAUTHENTICATED CELL-TOWER RECORDS, IN VIOLATION OF ITS OWN BAR AGAINST HEARSAY EVIDENCE, AS WELL AS THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION, AND ARTICLE I, SECTION 10 AND 16 OF THE OHIO CONSTITUTION.

{¶23} Assignment of Error No. 2:

{¶24} THE JUVENILE COURT ABUSED ITS DISCRETION AND VIOLATED AUSTIN'S DUE PROCESS RIGHTS WHEN IT ADMITTED PHOTOS OF UNAUTHENTICATED TEXT MESSAGES ALLEGEDLY TAKEN FROM A NON-TESTIFYING WITNESS' CELLPHONE, IN VIOLATION OF EVID.R. 101; EVID.R. 802; EVID.R 901; FIFTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION; ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION.

{¶25} Assignments of Error Nos. 1 and 2 both concern the mandatory transfer hearing conducted by the juvenile court. Fuell argues the juvenile court violated multiple constitutional provisions and rules of evidence by admitting the Cell Tower Analysis and the Text Message Photographs. We will address these purported violations separately.

{¶26} But first, we must briefly explain Ohio's mandatory transfer statute, R.C. 2152.12(A). That statute provides that after a complaint has been filed alleging that a child

---

2. R.C. 2929.02 and R.C. 2929.03 were amended effective April 12, 2021. All references to R.C. 2929.02 and R.C. 2929.03 in this opinion are to the versions of those statutes that were effective prior to April 12, 2021.

is delinquent for having committed an act that would be aggravated murder or murder if committed by an adult, the court "shall" transfer the case to adult court if (1) the child was 16 or 17 years of age at the time of the act charged, and (2) there is probable cause to believe that the child committed the act charged. R.C. 2152.12 (A)(1)(a)(i). The statute does not prescribe any procedures or rules applicable to the transfer hearing. Rule 30 of the Ohio Rules of Juvenile Procedure, which governs the juvenile court's relinquishment of jurisdiction for criminal prosecution in adult court, also does not provide specific guidance on the procedures to be used or the applicability of specific constitutional guaranties or the Rules of Evidence.

## A. Purported Constitutional Violations

{¶27} Fuell's first two assignments of error refer to multiple purported constitutional violations. Assignment of Error No. 1 states that the juvenile court's admission of the Cell Tower Analysis violated the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Sections 10 and 16 of Article I of the Ohio Constitution. Specifically, Fuell argues that the admission of the Cell Tower Analysis violated his Confrontation Clause rights because he did not have the opportunity to confront the individual who prepared the Cell Tower Analysis. He also alleges that the admission of the Cell Tower Analysis violated his due process rights, though he grounds his due process argument in the contention that due process includes the right to confront witnesses.

{¶28} The Confrontation Clause of the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *." Article I, Section 10 of the Ohio Constitution also includes a Confrontation Clause: "In any trial, in any court, the party accused shall be allowed * * * to meet the

witnesses face to face * * *."[3]  The Ohio Supreme Court has held that the Confrontation Clause in Article I, Section 10 "provides no greater right of confrontation than the Sixth Amendment * * *."  *State v. Self*, 56 Ohio St.3d 73, 79 (1990).

{¶29} The United States Supreme Court has explained that "[t]he right to confrontation is basically a trial right."  *Barber v. Page*, 390 U.S. 719, 725, 88 S.Ct. 1318 (1968).  A juvenile transfer hearing "is not a trial as it does not 'find as a fact that the accused minor is guilty of the offense charged. It simply finds the existence of probable cause to so believe.'"  *State v. Garner*, 6th Dist. Lucas No. L-18-1269, 2020-Ohio-4939, ¶ 19, quoting *State v. Iacona*, 93 Ohio St.3d 83, 93 (2001).

{¶30} The United States Supreme Court "has repeatedly declined to require the use of adversarial procedures to make probable cause determinations."  *Kaley v. United States*, 571 U.S. 320, 338, 134 S.Ct. 1090 (2014).  The federal courts have repeatedly held that the Sixth Amendment's Confrontation Clause does not apply to preliminary hearings.[4]  Likewise, the Ohio Supreme Court has held that the constitutional right to confront one's accusers "relates to the *actual trial* for the commission of the offense and not to the preliminary examination * * *."  (Emphasis added.)  *Henderson v. Maxwell*, 176 Ohio St. 187, 188 (1964).

---

3. Fuell refers to the Fourteenth Amendment in Assignment of Error No. 1 but otherwise makes no reference to it at all in his briefs.  It is unclear whether Fuell referred to the Fourteenth Amendment's due process clause or referred to the Fourteenth Amendment's incorporation of the Fifth and Sixth Amendments with respect to the states.  See *Pointer v. Texas*, 380 U.S. 400, 406 (1965) (Sixth Amendment Confrontation Clause rights apply to the states via the Fourteenth Amendment); *State v. Graham*, 136 Ohio St.3d 125, 2013-Ohio-2114, ¶ 19 (Fifth Amendment applies to states via the Fourteenth Amendment).  Regardless of Fuell's intent in referencing the Fourteenth Amendment, our analysis herein applies in the same manner to the Fourteenth Amendment.

4. See *United States v. Colasuonno*, 697 F.3d 164, 177 (2d Cir.2012) ("[T]he full protections of the Confrontation Clause do not apply to preliminary hearings."); *Peterson v. California*, 604 F.3d 1166, 1169-70 (9th Cir.2010) (defendant not constitutionally entitled to confront witnesses at preliminary hearing); *United States v. Andrus*, 775 F.2d 825, 836 (7th Cir.1985) ("The right to confrontation applies when the ability to confront witnesses is most important—when the trier of fact determines the ultimate issue of fact. Consequently, the sixth amendment does not provide a confrontation right at a preliminary hearing."); *United States v. Harris*, 458 F.2d 670, 677 (5th Cir. 1972) ("There is no Sixth Amendment requirement that [defendants] also be allowed to confront [witnesses] at a preliminary hearing prior to trial.").

**{¶31}** Fuell acknowledges that the United States Supreme Court and the Ohio Supreme Court have never held that the federal or state Confrontation Clauses apply at juvenile mandatory transfer hearings. But Fuell argues that the United States Supreme Court and the Ohio Supreme Court have *implied* that the federal Confrontation Clause does apply at such hearings, citing *Kent v. United States*, 383 U.S. 541, 563, 86 S.Ct. 1045 (1966), *Iacona* at 93, and *State v. Aalim*, 150 Ohio St.3d 489, 2017-Ohio-2956, ¶ 12.

**{¶32}** Fuell's reliance on these three cases is misplaced. In *Kent*, the United States Supreme Court, after noting that a number of courts had held that juveniles at transfer hearings are not owed certain fundamental due process rights that pertain to criminal proceedings, specifically *declined* "to rule that constitutional guaranties which would be applicable to adults charged with the serious offenses for which Kent was tried must be applied in juvenile court proceedings * * *." *Kent* at 556. *Kent* specifically referenced the right to confront one's accusers as one of these constitutional guaranties that it declined to analyze. *Id.* at 555. Likewise, the paragraph of *Aalim* to which Fuell cites only summarizes an argument made by a county prosecuting attorney regarding whether juvenile transfer hearings satisfy due process. *Aalim* at ¶ 12. In *Aalim*, the Ohio Supreme Court did not, itself, state or imply that juvenile transfer hearings must include the right to confront one's accusers. *See id.* Nor does *Iacona* support Fuell's argument, as that case includes no reference at all to the federal or state Confrontation Clauses. Fuell has not cited to even a single case implying that the Confrontation Clauses apply at juvenile transfer hearings, let alone holding this to be the case.

**{¶33}** But that does not mean that Ohio courts have been silent on the question of whether the federal or state Confrontation Clauses apply at juvenile transfer hearings. At least two of our sister districts have held that the Confrontation Clause *does not* apply at juvenile transfer hearings. The Seventh District Court of Appeals explained that "[t]he right

to confrontation through the presentation of a certain quality of evidence is generally considered a 'trial right.'" *In re B.W.*, 7th Dist. Mahoning No. 17 MA 0071, 2017-Ohio-9220, ¶ 37 (noting that Article I, Section 10 of the Ohio Constitution specifically refers to a trial: "[i]n any *trial*, in any court, the party accused shall be allowed * * * to meet the witnesses face to face * * *." [Emphasis added.] *Id.*).  The court observed that a transfer hearing "is a preliminary, non-adjudicatory proceeding as it does not determine whether the juvenile was delinquent." *Id.* at ¶ 18.  "At this preliminary hearing, the juvenile court's function is not to determine whether the juvenile is guilty of the charge but is to determine whether there is *probable cause to believe* the juvenile is guilty." (Emphasis sic.) *Id.*  Based upon this analysis, the Seventh District determined that the juvenile court was not bound by Confrontation Clause standards for the admissibility of evidence at the transfer hearing.  *Id.* at ¶ 41.

{¶34}  Similarly, the Sixth District Court of Appeals examined this issue and concluded that a juvenile does not have Confrontation Clause rights at a transfer hearing because the hearing is not a fact-finding trial and the juvenile's liberty is not yet at stake. *State v. Garner*, 6th Dist. Lucas No. L-18-1269, 2020-Ohio-4939, ¶ 26.  *Garner* was appealed, but the Ohio Supreme Court recently declined to accept the appeal for review. *State v. Garner*, 161 Ohio St.3d 1479, 2021-Ohio-802.

{¶35}  We agree with the reasoning set forth by our colleagues in the Seventh and Sixth districts.  Fuell's juvenile transfer hearing was non-adjudicatory, as it did not result in any conclusive factual findings that could be used against him at a subsequent trial.  The purpose instead was to determine Fuell's age at the time of the alleged incident and the existence of probable cause.  R.C. 2152.12(A)(1)(a)(i).  Based upon the foregoing analysis, we hold that the federal and state Confrontation Clauses were inapplicable at Fuell's transfer hearing.

{¶36} But Fuell does not limit his constitutional arguments to the Sixth Amendment and Article I, Section 10 of the Ohio Constitution. Fuell also argues that in admitting the Cell Tower Analysis and the Text Message Photographs the juvenile court also violated Fuell's due process rights under the Fifth Amendment and Article I, Section 16 of the Ohio Constitution. Fuell's argument regarding due process, as set forth in his brief, appears to be entirely based on the idea that confrontation rights are included within the requirements of due process, i.e., "it is settled that children do have a right to confront and cross-examine witnesses as a matter of *due process*." (Emphasis sic.) To the extent that Fuell argues that due process incorporates Confrontation Clause rights, we refer to our discussion of confrontation rights above.

{¶37} To the extent that Fuell makes a broader due process argument, we note that it is well-settled law that juveniles are entitled to due process of law in a hearing to relinquish jurisdiction to adult court. *Kent*, 383 U.S. at 562. In *Kent*, the United States Supreme Court held that due process is satisfied when a juvenile court issues a decision stating its reasons for the transfer after conducting a hearing at which the juvenile is represented by counsel. *Id.* at 554. The United States Supreme Court admonished that a transfer of a juvenile to adult court should not occur "without ceremony—without hearing, without effective assistance of counsel, without a statement of reasons." *Id.* Citing *Kent*, the Ohio Supreme Court has characterized a transfer hearing as a "'critically important'" proceeding and held that such a proceeding "'must measure up to the essentials of due process and fair treatment.'" *In re D.M.*, 140 Ohio St.3d 309, 2014-Ohio-3628, ¶ 11, quoting *Kent* at 562.

{¶38} But none of the requirements of due process that apply at a juvenile court proceeding were omitted here. The juvenile court conducted a hearing, Fuell was represented by counsel at that hearing, and the juvenile court issued an opinion explaining its reasons for transferring Fuell to adult court. *See Kent* at 554 (describing due process

requirements in a juvenile transfer hearing). Admitting hearsay or other evidence that could raise Confrontation Clause issues at such a hearing is not inconsistent with fundamental fairness and due process of law as described in *Kent. Id.* To the extent that Fuell argues that the transfer hearing violated his Fifth Amendment due process rights in some manner, we find no such violation.

**B. Rules of Evidence**

{¶39} Assignment of Error No. 1 alleges that the trial court erred when it admitted the Cell Tower Analysis in violation of the court's practice – referenced by the juvenile judge during the October 4, 2019 hearing – of not permitting hearsay at juvenile transfer hearings. Assignment of Error No. 2 alleges that the juvenile court erred when it admitted the Text Message Photographs in violation of the rule against hearsay, Evid.R. 802. Assignment of Error No. 2 also alleges that the trial court erred when it admitted the Text Message Photographs in violation of the evidence rule regarding authentication of evidence, Evid.R 901. Assignment of Error No. 2 also refers to violation of Evid.R. 101, but Fuell provides no argument whatsoever regarding Evid.R. 101.

{¶40} The state argues that the Rules of Evidence do not apply in juvenile mandatory transfer hearings. In fact, at least two of our sister districts have held that the Rules of Evidence do not apply in juvenile transfer proceedings. *In re B.W.*, 2017-Ohio-9220 at ¶ 48; *State v. Grays*, 1st Dist. Hamilton No. C-790914, 1981 WL 9566, *1 (Jan. 14, 1981).

{¶41} It is unnecessary for us to resolve the question of whether the Rules of Evidence applied at Fuell's mandatory transfer hearing and whether the Cell Tower Analysis and the Text Message Photographs were improperly admitted. This is because the purpose of the hearing was to determine probable cause only, the hearing did not result in any conclusive factual findings, and the state presented other evidence, exclusive of the

challenged evidence, sufficient to meet the probable cause standard.

{¶42} A juvenile court's probable cause determination in a transfer hearing involves questions of both fact and law. *In re A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, at ¶ 51. An appellate court will defer to the juvenile court's "determinations regarding witness credibility, but [will] review de novo the legal conclusion whether the state presented sufficient evidence to demonstrate probable cause to believe that the juvenile committed the acts charged." *Id.* The "probable" component of the probable cause determination means that the state must produce evidence that "raises more than a mere suspicion of guilt, but need not provide evidence proving guilt beyond a reasonable doubt." *Iacona*, 93 Ohio St.3d at 93.

{¶43} Lacey testified that she had encountered Fuell on several occasions in the days leading up to Ketring's death. She recognized him as one of the assailants at her grandparents' home. She recognized him both by his eyes, which she described as being "further back" or "indented" in his skull, and by his voice. Lacey further testified that the intruder she recognized as Fuell asked Ketring about "my $375," which was the exact amount she testified that Ketring had robbed Fuell of just a few days prior. Given that the intruder knew the exact amount taken in the earlier robbery, Lacey was nearly certain that the intruder was Fuell. Moreover, that robbery would have provided Fuell with the motive for the home invasion and murder, and Lacey's description of the robbery in the Comfort Inn parking lot was corroborated through Detective Tobias' review of various security camera videos.

{¶44} In other words, Lacey provided eyewitness testimony specifically identifying Fuell as one of the intruders and providing specific, credible reasons why she was able to identify Fuell, even with a mask. Lacey's testimony, if believed, would raise more than a mere suspicion of doubt concerning Fuell's involvement in the murder, and thus was

sufficient, by itself, to establish probable cause.  *See State v. E.T.*, 10th Dist. Franklin No. 17AP-828, 2019-Ohio-1204, ¶ 68 (affirming probable cause finding at juvenile transfer hearing based on single eyewitness testimony, despite witness being only "50 percent" certain regarding identity based upon a photo array); *In re A.J.S.* at ¶ 42.

{¶45}  But the state presented additional evidence that a gun barrel that matched the bullet that killed Ketring was positively matched to a gun barrel recovered from a vehicle in which Fuell was travelling.  And the day of the shooting, Fuell and his grandmother purchased a firearm with a barrel chambered in the same caliber as the barrel found in the vehicle.  Both barrels were believed to be interchangeable and could be swapped into the newly purchase firearm.  Thus, evidence was presented indicating that Fuell had, just hours after the murder, attempted to secure a firearm that would not link him to the murder.

{¶46} Through the foregoing, the state set forth evidence establishing probable cause that Fuell may have committed the offenses for which he was charged as a delinquent child.  *See In re A.J.S.*, 2008-Ohio-5307 at ¶ 54-55 (testimony of witness and police officer's testimony regarding recovered shell casings was "sufficient evidence to demonstrate probable cause to believe that A.J.S. fired six bullets in the parking lot").  Accordingly, the court did not err in granting the mandatory transfer.  Even if Fuell is correct that the Cell Tower Analysis and the Text Message Photographs were admitted in violation of the Rules of Evidence – a question we do not reach – the juvenile court's errors in admitting this evidence would have been harmless error.  *See State v. Price*, 10th Dist. Franklin No. 97APA02-151, 1997 WL 606875, *2-3 (Sept. 30, 1997) (holding that even if a trial court erred in denying the defendant's request to bring an additional witness at a

juvenile probable cause hearing, such error was harmless error).[5]

{¶47} Fuell's first and second assignments of error are overruled.

{¶48} Assignment of Error No. 3:

{¶49} AUSTIN WAS DEPRIVED OF HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WHEN COUNSEL: (1) FAILED TO MOVE TO EXCLUDE OR LIMIT CONCLUSIVE EXPERT OPINION TESTIMONY BASED ON TOOLMARK ANALYSIS EXCLUDING ALL OTHER POTENTIAL FIREARMS; AND (2) WHEN COUNSEL FAILED TO CONSULT WITH OR RETAIN HIS OWN FIREARMS EXPERT TO CONTEST THE STATE'S EXPERT TOOLMARK ANALYSIS. FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION; ARTICLE I, SECTION 10 AND 16 OF THE OHIO CONSTITUTION.

{¶50} Fuell contends he received constitutionally defective assistance of counsel when his attorney failed to introduce evidence, or expert testimony, that would challenge the science behind the forensic tool mark analysis performed by White, the state's firearms examiner. Fuell further argues that his counsel should have objected to White's testimony and specifically should have objected to White's opinion that the gun barrel recovered from Fuell's grandmother's vehicle was the same barrel from which the fatal bullet was fired.

{¶51} To prevail on an ineffective assistance of counsel claim, Fuell must establish (1) deficient performance by trial counsel, that is, performance falling below an objective standard of reasonable representation, and (2) prejudice, that is, a reasonable probability that but for counsel's errors, the result of the proceedings would have been different. *State v. Taylor*, 12th Dist. Fayette No. CA2018-11-021, 2019-Ohio-3437, ¶ 16, citing *Strickland v. Washington*, 466 U.S. 668, 687-688, 694, 104 S.Ct. 2052 (1984) and *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, ¶ 62. The failure to demonstrate either prong is fatal to an ineffective assistance of counsel claim. *State v. Kaufhold*, 12th Dist. Butler No. CA2019-

5. While Fuell refers specifically to Evid.R. 802 in Assignment of Error No. 2, and in Assignment of Error No. 1 Fuell only refers to a violation of a practice of not permitting hearsay at juvenile transfer hearings that was referenced by the judge during the October 4, 2019 hearing, the harmless error analysis above is the same in both cases.

09-148, 2020-Ohio-3835, ¶ 54. In considering an ineffective assistance claim, an "appellate court must give wide deference to the strategic and tactical choices made by trial counsel in determining whether counsel's performance was constitutionally ineffective." *State v. McLaughlin*, 12th Dist. Clinton No. CA2019-02-002, 2020-Ohio-969, ¶ 54.

{¶52} Fuell contends that there is a consensus developing within and without the judiciary challenging the science behind ballistic tool mark analysis and imposing limitations on expert opinion testimony in this realm of science in order to ensure compliance with Evid.R. 702. However, there is nothing in the record of this case to substantiate the claim that the methodology used by White was less than reliable. And a consideration of the case law of this state indicates instead that forensic ballistic comparison is a generally accepted method of expert analysis and opinion. *State v. Quiller*, 10th Dist. Franklin No. 15AP-934, 2016-Ohio-8163, ¶ 30 (noting that Ohio courts have generally found tool mark and ballistics analysis to be reliable and finding that the trial court did not err in allowing testimony of expert witness on tool mark and ballistics analysis); *State v. Langlois*, 6th Dist. Lucas No. L-11-1313, 2013-Ohio-5177, ¶ 40 (finding that "Such microscopic comparison testing is a generally accepted method of forensic analysis"); *State v. Johnson*, 10th Dist. Franklin No. 05AP-12, 2006-Ohio-209, ¶ 15 ("Given [the ballistics and tool mark expert's] explanation of his methodology, the trial court did not abuse its discretion by admitting his testimony, as his opinion was based on reliable, commonly accepted scientific principles"); *State v. Armstrong*, 11th Dist. Trumbull Nos. 2001-T-0120 and 2002-T-0071, 2004-Ohio-5635, at ¶ 66 ("The testimony given by [the expert] confirms that the tool-mark analysis technique is sufficiently reliable to aid the jury in reaching accurate results"). Accordingly, we do not find that Fuell has demonstrated any deficiency in his counsel's alleged failure to challenge the science underpinning forensic tool mark analysis.

{¶53} Fuell further argues that his counsel was ineffective for failing to retain an

expert to challenge White's methodology and conclusions. However, "'the failure to call an expert and instead rely on cross-examination does not constitute ineffective assistance of counsel.'" *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 66, quoting *State v. Nicholas*, 66 Ohio St.3d 431, 436 (1993). Fuell's argument that an expert could have challenged White's testimony and was needed to prevail at this hearing is purely speculative. Fuell fails to identify any expert witnesses who could have been called or what the expert would have said. Counsel's decision to rely on cross-examination appears to be a legitimate "tactical decision," to which deference is owed. *Id.*

{¶54} Additionally, we note that even if White's methodology had been found objectionable under Evid.R. 702 or had been undercut by competing expert testimony, Fuell would not be able to meet his burden under *Strickland* to demonstrate that the result of the proceedings would be different. Fuell's arguments concerning White's testimony go to the weight of the evidence. But this was a probable cause hearing and, as described previously, Lacey's testimony alone would present sufficient, reasonable grounds to conclude that Fuell may have committed the alleged offenses. Accordingly, we do not find that the outcome would have changed even in the absence of White's testimony. Fuell's third assignment of error is overruled.

{¶55} Assignment of Error No. 4:

{¶56} THE CUMULATIVE EFFECT OF THE ERRORS DEPRIVED AUSTIN OF HIS RIGHT TO A FAIR TRANSFER HEARING BECAUSE ABSENT THE IMPROPER CELL-PHONE AND TOOLMARK EVIDENCE, THE PROSECUTOR FAILED TO PROVIDE RELIABLE, CREDIBLE EVIDENCE PROVING AUSTIN'S INVOLVEMENT BEYOND JUST A MERE SUSPICION FIFTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION; ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION.

{¶57} Fuell argues that the cumulative effect of errors that occurred during the transfer hearing denied him due process of law. In line with his first three assignments of error, Fuell contends that his inability to confront witnesses, the alleged erroneous

admission of certain evidence, and his attorney's failure to challenge the state's expert evidence, when considered collectively, denied him a fair hearing.

{¶58} Under the doctrine of cumulative errors, a reviewing court "will reverse a conviction when the cumulative effect of errors deprives a defendant of a fair trial even though each of the instances of trial-court error does not individually constitute cause for reversal." *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, ¶ 140.

{¶59} Fuell cites no authority for the proposition that the cumulative error doctrine applies to juvenile transfer proceedings. Assuming that the doctrine is applicable, we have already overruled all of Fuell's assignments of error concerning the transfer hearing. Consequently, Fuell was not deprived of a fair hearing and the cumulative error doctrine is inapplicable. Fuell's fourth assignment of error is overruled.

{¶60} Assignment of Error No. 5:

{¶61} AUSTIN'S MANDATORY LIFE-TAIL SENTENCE IS UNCONSTITUTIONAL BECAUSE THE IMPOSITION OF ANY LIFE IMPRISONMENT SENTENCE UPON A JUVENILE OFFENDER WITHOUT TAKING INTO CONSIDERATION FACTORS COMMANDED BY THE FIFTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION; AND ARTICLE I SECTIONS 9, 10, AND 16 OF THE OHIO CONSTITUTION, VIOLATES THOSE PROVISIONS.

{¶62} Fuell was 17 years old at the time of the home invasion and Ketring's death. Fuell argues that R.C. 2929.02(B)(1)'s mandatory sentence of life imprisonment with the possibility of parole after 15 years constituted cruel and unusual punishment prohibited by the federal and Ohio constitutions because a mandatory sentence does not allow a court to consider a juvenile defendant's youth.

{¶63} The Eighth Amendment to the United States Constitution states, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." Article I, Section 9 of the Ohio Constitution includes identical language.

{¶64} "Central to the [United States] Constitution's prohibition against cruel and

unusual punishment is the 'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.'" *In re C.P.*, 131 Ohio St.3d 513, 2012-Ohio-1446, ¶ 25, quoting *Weems v. United States*, 217 U.S. 349, 367, 30 S. Ct. 544 (1910). In 2005, the United States Supreme Court held that the Eighth Amendment prohibits the death penalty with respect to juveniles. *Roper v. Simmons*, 543 U.S. 551, 570-571, 125 S.Ct. 1183 (2005). In 2010, the Court held that the Eighth Amendment prohibits life imprisonment without the possibility of parole for nonhomicide offenses with respect to juveniles. *Graham v. Florida*, 560 U.S. 48, 74, 130 S.Ct. 2011 (2010). In 2012, the Court went a step further, holding that the Eighth Amendment requires that a court consider the youth of a juvenile convicted of homicide before imposing a sentence of life imprisonment without the possibility of parole. *Miller v. Alabama*, 567 U.S. 460, 489, 132 S.Ct. 2455 (2012). Ohio's chief justice has characterized the United States Supreme Court as noting in these decisions that "minors are less mature and responsible than adults, that they are lacking in experience, perspective, and judgment, and that they are more vulnerable and susceptible to the pressures of peers than are adults." *State v. Long*, 138 Ohio St.3d 478, 2014-Ohio-849 at ¶ 33 (O'Connor, C.J., concurring). "Generally stated, the rationale for the disparate treatment is that 'juveniles have diminished culpability and greater prospects for reform' and '"are less deserving of the most severe punishments."'" *Long, Id.* quoting *Miller* at 2464, in turn quoting *Graham* at 68.

{¶65} The Ohio Supreme Court has twice applied *Miller* in cases where a juvenile defendant was sentenced under R.C. 2929.03, the aggravated murder penalty statute. Under R.C. 2929.03(A), a court may impose any of the following four sentences on a defendant convicted of aggravated murder: (1) life imprisonment without the possibility of parole, (2) life imprisonment with the possibility of parole after 20 years, (3) life imprisonment with the possibility of parole after 25 years, or (4) life imprisonment with the

possibility of parole after 30 years. R.C. 2929.03(A)(1)(a)-(d).

{¶66} The Ohio Supreme Court addressed the first of these potential sentences – life imprisonment without the possibility of parole – in *Long*. The court held that a trial court, "in exercising its discretion under R.C. 2929.03(A), must separately consider the youth of a juvenile offender as a mitigating factor before imposing a sentence of life without parole in light of *Miller v. Alabama* * * *." *Long* at ¶ 1. The failure to consider a juvenile offender's youth in this situation was a violation of the Eighth Amendment. *Id.* at ¶ 33, 36-37 (O'Connor, C.J., concurring).

{¶67} *Long* did not address the question of whether the youth of a juvenile defendant convicted of aggravated murder must be considered before imposing one of the other three sentences of life imprisonment with the possibility of parole after 20, 25, or 30 years available under R.C. 2929.03(A). The Ohio Supreme Court addressed precisely this issue in *State v. Patrick*, Slip Opinion No. 2020-Ohio-6803. Patrick was sentenced to life imprisonment with the possibility of parole after 30 years under R.C. 2929.03(A) for aggravated murder, plus a consecutive, mandatory 3-year prison term for a firearm specification, and a 3-year prison term for tampering with evidence, to run concurrently with the other sentences. *Id.* at ¶ 7. This was effectively a sentence of life imprisonment with parole eligibility after 33 years. *Id*. Patrick argued that the trial court unconstitutionally failed to consider his youth during sentencing. The Ohio Supreme Court held that, "consistent with our decision in [*Long*], a trial court must separately consider the youth of a juvenile offender as a mitigating factor before imposing a life sentence under R.C. 2929.03, even if that sentence includes eligibility for parole." *Id.* at ¶ 2. While acknowledging that the state did not recommend that Patrick receive life imprisonment for aggravated murder, the Ohio Supreme Court noted that life without parole was still "a potential sentence for Patrick[,]" as "the trial court's discretionary-sentencing task [under R.C. 2929.03] required it to choose

from a number of life-sentencing options, with or without parole." *Id.* at ¶ 31.

{¶68} While *Long* and *Patrick* analyzed R.C. 2929.03, Fuell was sentenced under a different statute, R.C. 2929.02, as he was convicted of murder, not aggravated murder. Nevertheless, Fuell argues that *Patrick* is controlling and requires that we find that R.C. 2929.02(B)(1)'s mandatory sentence for murder is unconstitutional as applied to juveniles – including of course Fuell – because the statute does not permit a trial court to consider a juvenile's age. The state argues that R.C. 2929.02(B)(1) is not unconstitutional under *Patrick* because it provides a juvenile with a meaningful possibility of parole after a relatively short 15 years, and that the parole board is specifically required to consider age in its parole decisions.

{¶69} Before considering these arguments, we must note that Fuell failed to object to his sentence upon constitutional or any other grounds before the trial court. It is well established that "the constitutionality of a statute must generally be raised at the first opportunity and, in a criminal prosecution, this means in the trial court." *State v. Awan*, 22 Ohio St.3d 120, 122 (1986). Therefore, an appellant's "'[f]ailure to raise the issue of the constitutionality of a statute or its application at the trial court level generally constitutes waiver of that issue and need not be heard for the first time on appeal.'" *State v. Myers*, 12th Dist. Madison No. CA2012-12-027, 2014-Ohio-3384, ¶ 12, quoting *State v. Golden*, 10th Dist. Franklin No. 13AP-927, 2014-Ohio-2148, ¶ 11; *accord Awan* at 122.

{¶70} The waiver doctrine stated in *Awan* is discretionary, and an appellate court may review claims of defects affecting substantial rights for plain error, despite an appellant's failure to bring such claims to the attention of the trial court. *In re M.D.*, 38 Ohio St.3d 149, 151 (1988); Crim.R. 52(B). "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Crim.R. 52(B). Crim.R. 52(B) places three limitations on a reviewing court's decision to correct an error not

raised before the trial court. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). First, an error, "i.e., a deviation from a legal rule," must have occurred. *Id.*, citing *State v. Hill*, 92 Ohio St.3d 191, 200 (2001), in turn citing *United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770 (1993). Second, the error complained of must be plain, i.e., it must be "an 'obvious' defect in the * * * proceedings." *Id.*, quoting *State v. Sanders*, 92 Ohio St.3d 245, 257 (2001), in turn citing *State v. Keith*, 79 Ohio St.3d 514, 518 (1997). Third, the error must have affected "substantial rights." *State v. Martin*,154 Ohio St.3d 513, 2018-Ohio-3226, ¶ 28.

{¶71} As just stated, plain error must be "plain." *Barnes* at 28 ("The lack of a definitive pronouncement from this court and the disagreement among the lower courts preclude us from finding plain error"). "[I]f a forfeited error is not plain, a reviewing court need not examine whether the defect affects a defendant's substantial rights; the lack of a 'plain' error within the meaning of Crim.R. 52(B) ends the inquiry and prevents recognition of the defect." *Id.* In *Barnes*, the Ohio Supreme Court held that a court of appeals erred when it applied plain error analysis when the putative error was not actually "plain." *Id.*

{¶72} Here it is not "plain" that *Patrick* requires consideration of age when a trial court imposes R.C. 2929.02(B)(1)'s mandatory sentence on a juvenile defendant convicted of murder. Stated another way, it is not "plain" that R.C. 2929.02(B)(1)'s mandatory sentence of life imprisonment with the possibility of parole after 15 years is unconstitutional under the reasoning of *Patrick*. There is certainly language in *Patrick* that suggests that *may* be the case. For example, *Patrick* states, "we conclude that the difference between a sentence of life in prison with parole eligibility after a term of years and a sentence of life without the possibility of parole is not material for purposes of an Eighth Amendment challenge by an offender who was a juvenile when he or she committed the offense." 2020-Ohio-6803 at ¶ 33. *Patrick* further stated that "the severity of a sentence of life in prison on

a juvenile offender, even if parole eligibility is part of the life sentence, is analogous to a sentence of life in prison without the possibility of parole for the purposes of the Eighth Amendment." *Id.* at ¶ 36.

{¶73} But there are also strong reasons to doubt that *Patrick* extends as far as Fuell would have us find. First, there is the simple fact that *Patrick* concerns R.C. 2929.03 but Fuell was sentenced pursuant to a *different* statute, R.C. 2929.02. *Patrick* did not involve the statute at issue in this case, and therefore *Patrick* is not necessarily controlling. *See State v. Payne*, 114 Ohio St. 3d 502, 2007-Ohio-4642 at ¶ 11 ("'[a] reported decision, although a case where the question might have been raised, is entitled to no consideration whatever as settling * * * a question not passed upon or raised at the time of the adjudication'").

{¶74} Second, a close reading of *Patrick* reveals that the Ohio Supreme Court was focused on the need to consider a juvenile defendant's youth when a sentencing court is presented with sentencing *options* that included the possibility of life imprisonment. *Patrick* emphasizes that R.C. 2929.03 involved a "range" of "life-term options," and that even when the state did not recommend a life sentence without the possibility of parole, that sentence remained an "option." 2020-Ohio-6803 at ¶ 32. The Ohio Supreme Court stated that if age must be considered when a court considers the "harshest penalties" – here the Ohio Supreme Court cited to *Miller*'s discussion of life imprisonment without the possibility of parole – "then youth is also a necessary consideration when a sentencing court determines *at what point* parole eligibility should be available during a life sentence." (Emphasis added.) *Id.* And immediately after making a statement suggesting that life sentences with and without parole are analogous, *Patrick* states that "the need for an individualized sentencing decision that considers the offender's youth and its attendant characteristics is critical *when life without parole is a potential sentence*," suggesting that youth need only be

considered when a court considers multiple sentencing options that involve the potential of a life sentence without the possibility of parole. (Emphasis added.) *Id.* at ¶ 36. The Ohio Supreme Court's emphasis in *Patrick* was on considering youth when deciding *between* the four optional sentences authorized in R.C. 2929.03, one of which was life without the possibility of parole. *Id.* at ¶ 32-36. A sentence of life imprisonment without the possibility of parole was not an option available to the court in this case, where Fuell pleaded guilty to murder and the trial court was required to apply the mandatory sentence of life imprisonment with the possibility of parole after 15 years as provided in R.C. 2929.02(B)(1).

{¶75} Third, *Patrick* did not hold that the least of R.C. 2929.03's four possible sentences – that is, life imprisonment with the possibility of parole after 20 years – was unconstitutional when applied to a juvenile. Far from it. We are unaware of any decision by the Ohio Supreme Court or any other court holding that a life sentence with the possibility of parole after 15 years is unconstitutional when applied to a juvenile offender. The absence of any such decision is unsurprising, as a sentence of life in prison with the possibility of parole after 15 years provides a juvenile with a meaningful possibility of release. A juvenile defendant who commits murder and is sentenced at age 17 could be eligible for release from prison at age 32 – hardly the type of lifetime scenario that so concerned the Ohio Supreme Court in *Patrick*. *Id.* at ¶ 35, 39-41. If the Ohio Supreme Court in *Patrick* did not hold that a 20-to-life sentence is unconstitutional there is certainly an argument that a 15-to-life sentence cannot be unconstitutional.

{¶76} In other words, there are plausible arguments as to why the reasoning applied in *Patrick* may or may not require a court to hold that R.C. 2929.02(B)(1)'s mandatory sentence is unconstitutional as applied to juveniles, including Fuell. The Ohio Supreme Court has not held that the mandatory sentence available under R.C. 2929.02(B)(1) is unconstitutional as applied to juveniles. In this situation we therefore do not find that the

trial court committed "plain" error, and we decline to exercise our discretion to apply plain error analysis here, where Fuell failed to object to his sentence. *Barnes*, 94 Ohio St. 3d at 28 ("[I]f a forfeited error is not plain, a reviewing court need not examine whether the defect affects a defendant's substantial rights; the lack of a 'plain' error within the meaning of Crim.R. 52(B) ends the inquiry and prevents recognition of the defect."). Fuell's fifth assignment of error is overruled.

## IV. Conclusion

{¶77} For the reasons stated above, we overrule all of Fuell's assignments of error.

{¶78} Judgment affirmed.

M. POWELL, P.J., and HENDRICKSON, J., concur.